Robert LUNDQUIST, Plaintiff,

v.

Margaret HECKLER, Secretary of Health and Human Services, Defendant.

No. 84 C 8955.

United States District Court, N.D. Illinois, E.D.

Sept. 4, 1985.

Supplemental Memorandum Opinion and Order Sept. 11, 1985.

---

Joseph Antolin, Denise Poloyac, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Robert Lundquist ("Lundquist") seeks judicial review of a final decision of Secretary of Health and Human Services Margaret Heckler ("Secretary") denying Lundquist's claim for supplemental security income ("SSI") disability benefits. Lundquist initially applied for benefits under Social Security Act ("Act") Title XVI, 42 U.S.C. § 1381a. After the February 22, 1984 hearing, Administrative Law Judge Thomas H. Ploss ("ALJ Ploss" or simply the "ALJ") denied Lundquist's application on June 27, 1984. Lundquist then exhausted his administrative law remedies (a process that resulted in the ALJ's decision becoming Secretary's) and brought this action against Secretary pursuant to Act § 1631(c)(3), 42 U.S.C. § 1383(c)(3).

1. See Appendix.

As always in these cases, the parties have filed cross-motions for summary judgment. For the reasons stated in this memorandum opinion and order, each party's motion is denied. Instead Lundquist's application is remanded to Secretary for proceedings consistent with this opinion.

ALJ Ploss' decision (which became Secretary's) rested on his conclusions (R. 8) that:

1. Lundquist "does not have a severe impairment" and therefore is not "disabled" within the meaning of the Act.

2. Lundquist failed to follow a "prescribed" treatment (weight loss) that could have diminished his symptoms.

Lundquist disputes the decision as not supported by the substantial weight of the evidence and also ascribes the following errors to the ALJ:

1. He applied an improper "severity" standard at step two of the five-step sequential evaluation process.

2. He wrongly discredited Lundquist's testimony as to pain.

3. He failed to give proper weight to the medical reports of Lundquist's treating physician.

4. He misconstrued a mere recommendation to lose weight as a "prescribed" treatment for Lundquist's pain.

### Facts [1]

Lundquist was 52 at the time of the hearing. He has an eleventh grade education (R. 38) and can read and write (R. 39). Most recently he has held various jobs through the CETA program and at the post office, but he has not worked since 1978 (R. 282–83).

Lundquist complains chiefly (though not solely) of extreme pain in his legs and lower back. His medical problems have led him repeatedly to seek treatment and have resulted in several periods of hospitalization. Several expert opinions as to the

nature of Lundquist's ailments appear in the record:

1. On May 12, 1980 consultative physician Dr. Shroff examined Lundquist and diagnosed the presence of osteoarthritis, pulmonary disease, hypertension, obesity and varicose veins in both legs (R. 108).

2. In November 1980 Lundquist entered Bethany Methodist Hospital, complaining of weakness and numbness in his legs and constant back pain. Dr. Hatfield, Lundquist's treating physician, diagnosed Lundquist as suffering from lumbosacral spine arthritis, essential hypertension, obesity and emphysema (R. 124). Dr. Hatfield also noted Lundquist was receiving medication pursuant to a previous diagnosis of angina (*id.*).

3. In March 1981 a CAT scan by a Dr. Melamed revealed a bulging disc and degenerative disc changes and suggested a herniated disc (R. 148).

4. Lundquist entered Ravenswood Hospital for two days in June 1982, again complaining of back pain. Dr. Hatfield concluded Lundquist suffered from refractive back pain, obesity and hypertension (R. 259). Dr. Hatfield's discharge recommendations included "disability" (*id.*).

5. In October 1982 Dr. Hatfield referred Lundquist to Dr. Lazar, a neurologist. Dr. Lazar concluded Lundquist suffered from possible severe spinal stenosis or meralgia paresthetica (R. 261). On November 8, 1982 [2] Lundquist had a myelogram (recommended by Dr. Lazar), which revealed indentations on both sides of the spinal canal. Dr. Poteshman, who read the x-rays, concluded Lundquist's condition possibly arose from bulging annulus or spondylosis (R. 265).

6. Dr. Hatfield conducted another medical evaluation of Lundquist at the same time as the November 1982 myelogram. Dr. Hatfield diagnosed chronic back and lumbosacral spine instability, spondylolisthesis, hypertension and obe-

sity (R. 305). Dr. Hatfield's treatment notes from April 1983 to March 1984 refer to that diagnosis (R. 309) and regularly record Lundquist's chronic back pain (R. 309-10).

7. Dr. Moffitt, a consultative physician retained by Secretary, examined Lundquist in August 1983 (R. 270). Dr. Moffitt diagnosed chronic lumbar myositis and degenerative joint disease of the lumbar spine (R. 273).

Lundquist testified to constant back pain (R. 58) and flashing pains in the legs ("like an ice pick in there or like atoms going off in there," R. 41). He said he cannot walk three blocks without getting those "ice pick" pains (R. 40-41) and experiences difficulty climbing stairs (R. 38). He carries a cane (R. 30), as recommended by Dr. Hatfield (R. 309), and wears an Ace bandage on his right knee (R. 32). Although he does his own housework, he never leaves his basement apartment except to visit his girlfriend and son and to see his doctor (R. 43-45).

*Applying the Statutory Framework*

To establish an entitlement to disability benefits, a claimant must show he or she is "disabled." 42 U.S.C. § 1382c(a)(3)(A) defines an individual as disabled:

if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months....

*Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir.1984) summarizes Secretary's five-step test [3] for "disability":

The following steps are addressed in order. (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An af-

**2.** Though the typed report bears a "10/8/82" date, that is clearly in error. Dr. Lazar's recommendation of the myelogram was made October 20 (R. 261), the hospital admission record is dated 11/7/82 (R. 262) and the doctors' hand-

written progress notes are dated 11/7/82 and 11/8/82 (R. 263-64).

**3.** 20 C.F.R. § 404.1520.

firmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops inquiry and leads to a determination that the claimant is not disabled.

ALJ Ploss denied Lundquist's claim under the step two "severity" requirement, terminating his analysis with the conclusion that Lundquist's ailments were not "severe." That denial cannot stand in the face of our Court of Appeals' decision in *Johnson v. Heckler*, 769 F.2d 1202 (7th Cir.1985). *Johnson*, at 1212 held the step two "severity" requirement violated the Act. It therefore enjoined Secretary "from enforcing the step two rules and regulations."*

What remains, then, is to determine whether the appropriate result here is to reverse Secretary outright or to remand for a new hearing in conformance with *Johnson* (see *id.*, at 1213) and, if the latter, to define the scope of that new hearing. Discussion of those issues follows.

There is no question Lundquist suffers from multiple impairments representing (individually or in the aggregate) a material level of severity,[4] though they do not appear to "meet or exceed" any of the list of specific impairments (sequential step 3). And the record also establishes without dispute Lundquist cannot perform his last relevant work (sequential step 4). That leads to Secretary's burden on the question posed in sequential step 5 (*Johnson*, at 1210, quoting *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir.1982)):

> The burden then shifts to the Secretary to show that the claimant remains capable of performing other work in view of

the vocational factors of age, education, and work experience: "[o]nce an impairment of sufficient severity is demonstrated ... which precludes the type of work previously engaged in, the burden of going forward shifts to the Secretary."

On that score Lundquist, stating he has negated his ability to perform even "light" work as defined by Secretary's regulations (see Lundquist Mem. 5 and his general Rule 12(e) statement), says (Lundquist Mem. 14):

> As has been previously discussed, Mr. Lundquist has a residual functional capacity ("RFC") for at most sedentary work. *See* p. 9 *supra.* Mr. Lundquist is a person approaching advanced age (age 52 at the time of the hearing), has at most a high school education, and has only unskilled work experience. Applying these factors to the grid, Mr. Lundquist is disabled under Rule 201.12. 20 C.F.R. Part 400, Subpart P, Appendix 2.

Though that position appears to have considerable force, this Court is not after all a de novo hearing officer. And given the nature of Secretary's argument (her memorandum was filed before the decision in *Johnson,* and hence she relied on the ALJ's second-step determination), she has really had no opportunity to counter Lundquist's contention at step 5.

Accordingly this Court will not reverse Secretary outright. Instead it remands this case to Secretary for prompt reconsideration in light of this opinion. For that purpose, however, it is appropriate to comment on a few other aspects of the ALJ's opinion.[5]

---

* This opinion was issued in 1985, shortly after the Seventh Circuit had handed down its *Johnson* decision. Since then *Bowen v. Yuckert*, — U.S. ——, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) has *upheld* the validity of step two, reversing a Ninth Circuit decision that had reached the same result as *Johnson*. On June 16, 1987 the Supreme Court therefore vacated and remanded *Johnson*, — U.S. ——, 107 S.Ct. 3202, 96 L.Ed.2d 690. That reversal of the *Johnson* holding does not however affect the bulk of the discussion in this opinion (particularly the portion at pp. 785–87).

4. ALJ Ploss himself found (R. 12) Lundquist's impairments included lumbosacral arthritis, chronic lumbar myositis, moderate degenerative

joint disease, hypertension, exogenous obesity and emphysema. As this Court has previously stressed, the properly-applied "severity" concept represents nothing more than an "administrative convenience" that "should be employed only when a claim is so groundless that any analysis of the claimant's work experience or residual functional capacity would be a waste of time." *McCullough v. Heckler*, 583 F.Supp. 934, 937 (N.D.Ill.1984). See also *Johnson*, at 1209.

5. It is true ALJ Ploss considered the remaining topics in the context of evaluating the presence or absence of a disability. However, the same factors may be relevant toward a determination

### 1. Wrongful Discrediting of Lundquist's Testimony

■ ALJ Ploss' position as hearing officer certainly placed him in a position to observe Lundquist to appraise his credibility. That kind of determination, however, need not be blindly rubberstamped by this Court. *Garfield*, 732 F.2d at 610.

Here the ALJ almost wholly discounted Lundquist's complaints of pain (R. 10):

> [T]he severity of the claimant's alleged pain is not supported by the objective medical findings of record.

ALJ Ploss later described Lundquist's testimony as only "partially credible" (R. 12).[6]

Yet ALJ Ploss himself acknowledged (R. 12) the existence of six separate impairments that Lundquist asserts form the medical basis of his pain. No effort is made by the ALJ to explain what appears such an inherent inconsistency. Those impairments, unquestionably supported by the "objective medical findings," plainly provide an objective basis for Lundquist's subjective complaints about pain. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) put it this way:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

Lundquist has more than met the standard prescribed by *Polaski* (and the similar case law in this Circuit).[7]

Without any desire to be overly critical of the ALJ's efforts to create a full record, this Court notes a number of the ALJ's early observations during the hearing smack of playing amateur doctor (R. 31–34). That tendency is dangerous—in a related context it has led to judicial criticism of the "sit and squirm" findings by ALJs. *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir.1982); *Tyler v. Weinberger*, 409 F.Supp. 776, 788–89 (E.D.Va.1976); *see Whitney*, 695 F.2d at 788.

Whatever the reason, what is significant here is the ALJ's erroneous disregard—without explanation—of Lundquist's complaints, given the supporting medical evidence. See *Szulyk v. Heckler*, 575 F.Supp. 1266, 1269 (N.D.Ill.1984) (ALJ commits error when without further explanation he characterizes plaintiff's complaints as "not entirely credible"). That error must not be repeated on remand.

### 2. Undervaluation of the Treating Physician's Conclusions

Lundquist also contends the ALJ undervalued the conclusions of Lundquist's treating physician Dr. Hatfield. ALJ Ploss said (R. 12):

> None of these [Dr. Hatfield's] notes contain any clinical signs or findings of severe impairment.

In that respect the ALJ simply missed Dr. Hatfield's references to (1) prior diagnoses based on such clinical signs (R. 309), (2) Lundquist's limp (R. 309) and (3) the findings of positive (that is, abnormal) straight leg raising test results (R. 309–10).[8]

---

whether Lundquist can perform other "substantial gainful work which exists in the national economy" (42 U.S.C. § 1382c(a)(3)(B)).

6. That unexplained finding was followed by the statement that "these symptoms are largely enhanced by the claimant's exogenous obesity and have, therefore, been given little evidentiary weight" (an unintended pun?). By introducing (at this level of discussion) the issue of recommended weight loss, the ALJ has really mixed apples and oranges. If Lundquist suffered disabling pain—as is demonstrated not only subjectively but by uncontroverted medical evidence—that pain is not diminished by the possibility weight reduction "may" (the ALJ's own word, R. 12) have reduced that pain as well.

7. Some courts have even held pain alone, without objective evidence to support a claimant's testimony, may be disabling. See, e.g., *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir.1984).

8. Dr. Hatfield's notes also repeatedly state "disability recommended" (R. 309–10). That ultimate conclusion is certainly not binding on the ALJ, particularly because it goes to the ultimate issue for the ALJ's decision. But its underpinnings must be considered and the ALJ must explicitly state his reason for rejecting them. *Garfield*, 732 F.2d at 610, quoting with approval this Court's opinion in *Holndoner v. Schweiker*, 542 F.Supp. 739, 742 (N.D.Ill.1982).

Thus ALJ Ploss both misstated the tenor of Dr. Hatfield's notes and failed to explain why he rejected them. On remand the ALJ should explicitly consider Dr. Hatfield's relevant findings.[9]

### 3. Advice To Lose Weight

■ ALJ Ploss concluded Lundquist's failure to follow a "prescribed treatment" (R. 11–12) precludes a finding of disability.[10] It is not entirely clear whether Hatfield's 1980 clinical resume (R. 124–25) listed weight loss as a prescribed treatment or simply a recommendation to Lundquist. But far more relevant for current purposes, Dr. Hatfield's later notes (which Secretary herself urges are the relevant evidence bearing on Lundquist's *present* disability) merely say "weight loss recommended" (R. 309). Recommendations do not constitute a "prescribed" treatment. *Cassiday v. Schweiker*, 663 F.2d 745, 749 (7th Cir.1981).

Moreover, no record evidence suggests weight loss would restore Lundquist's ability to work. All the ALJ can do in that respect is guess that losing 100 pounds "may have diminished [Lundquist's] subjective symptoms" (R. 12). Neither the ALJ nor this Court is free to make such a hypothetical medical diagnosis that mere weight loss might "diminish," let alone eradicate, Lundquist's impairments.

### Conclusion

Both parties' motions for summary judgment are denied. Secretary's decision is vacated, and this case is remanded for reconsideration in light of *Johnson* and this opinion under the following conditions:

1. Secretary shall designate an ALJ other than ALJ Ploss to consider and decide the remaining issues in the case.

9. Lundquist R.Mem. Ex. A is a June 14, 1985 report from a Dr. Groves, diagnosing Lundquist's condition as muscle contracture lumbosacral spine and possible radiculitis lumbosacral spine. That evidence too should be considered on remand.

10. 20 C.F.R. § 404.1530(a) reads:
In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.

2. In light of the limited scope on remand, the ALJ decision shall be rendered within 91 days.

### Appendix

Two aspects of the statement of facts in this opinion call for special comment. Because they are somewhat too long for footnote treatment, they are dealt with in this Appendix.

First, Secretary's counsel did not comply (though Lundquist's did) with this District Court's General Rule 12, requiring statements of the material facts entitling a movant to summary judgment or those as to which a material fact issue would preclude such a judgment. Even though the facts in any social security case such as this one are bounded by the administrative record provided to the court, the General Rule 12(e) and 12(f) statements still play their intended role of focusing any factual disputes—any areas in which the evidence looks two ways.[1] Under the last sentence of General Rule 12(f), this Court could properly have treated everything in Lundquist's General Rule 12(e) statement as admitted for purposes of the current motions. Because of the absence of any factual dispute (except as noted in the next section of this Appendix), this Court has not handled matters in precisely that way, however.

Second, Secretary has taken a crabbed view of the relevant evidence because of Lundquist's several earlier unsuccessful SSI applications. Before the current (June 20, 1983) application (R. 215), Lundquist had filed for benefits on April 21, 1980 (R. 64), October 3, 1980 (R. 78), May 13, 1982 (R. 164) and October 22, 1982 (R. 193). Each application had been turned down, the last on December 2, 1982 (R. 213).

1. Perhaps because cases involving social security benefits always proceed on the administrative record below, claimants seldom comply with General Rule 12(e)—and this Court never insists on such compliance as a condition to a summary judgment motion. But where (as here) the claimant does conform to the rule, Secretary should either do so as well or seek specific permission not to.

Secretary urges res judicata precludes consideration of any pre-December 2, 1982 evidence. That of course is conceptually mistaken. ALJ Ploss properly concluded res judicata prevented finding Lundquist disabled before the December 1982 date, and that would also bar a disability finding as of any later date involving no change in Lundquist's condition (though there could be an interesting question whether any changes in condition should be measured from October 22, 1982 (the hearing date) or December 2 (the decision date)). But especially where a potentially disabling condition may be a progressive or deteriorating one (and that is certainly true of back problems and of continuing pain), earlier medical evidence may well be relevant in evaluating the applicant's current situation. Thus the ALJ could (and did in fact) consider pre-December 2, 1982 evidence when assessing Lundquist's present disability status (R. 9–10). In any event, Dr. Hatfield's post–1982 treatment notes reaffirm many of the prior diagnoses and conclusions (R. 309–10).

## SUPPLEMENTAL OPINION

On September 4, 1985 this Court issued its memorandum opinion and order (the "Opinion") remanding this case to the Secretary of Health and Human Services ("Secretary") for reconsideration in light of the Opinion and of our Court of Appeals' recent decision in *Johnson v. Heckler*, 769 F.2d 1202 (7th Cir.1985). In still another illustration of serendipity, this Court has just received[1] our Court of Appeals' opinion in *Rousey v. Heckler*, 771 F.2d 1065 (7th Cir.1985), prompting this supplement to the Opinion.

*Rousey*, like *Johnson*, was authored by Judge Bauer. Like this case, *Rousey* dealt with an ALJ who had impermissibly substituted himself for a doctor in making his own decision about the effects of the claimant's asserted failure to follow "prescribed treatment." Except for the difference in the nature of the doctors' recommendations

(quitting smoking in *Rousey*, losing weight here), a portion of the *Rousey* opinion, 771 F.2d at 1069 might well have been written for this case:

> But this argument ignores the reality of the Secretary's role in making disability determinations. These decisions must be based on testimony and medical evidence in the record or on the regulations. The ALJ cannot make his own independent medical determinations about the claimant. *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir.1982). It was therefore improper for the ALJ to make his own determination regarding the prognosis of recovery should Mrs. Rousey stop smoking, when the record was devoid of any evidence that she could return to work if she quit smoking.

Accordingly *Rousey* buttresses the conclusion reached in the Opinion. It may be noted parenthetically that the result in *Rousey* was also a remand to Secretary for proceedings consistent with that opinion.

---

1. This Court reads all the Court of Appeals' slip opinions immediately on their receipt. Because those opinions are delivered in weekly batches, there is always a time lag between issuance of an opinion and such delivery. Hence this Court was unaware of the *Rousey* opinion when it wrote the Opinion in this case a week later.